THOMAS G. HARPER, PLAINTIFF, V. NORBERTO R. SILVA, M.D., ET
AL., DEFENDANTS.
399 N.W.2d 826

Filed January 30, 1987.    No. 86-273.

Debra R. Nickels of Welsh, Sibbernsen & Roach, Gary D.
McCallister, and Philip A. Burdick, for plaintiff.

John P. Grant and Robert G. Lange and, on brief, Robert M.
Spire, Attorney General, and Martel J. Bundy, for defendant
Excess Liability Fund.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE,
and SHANAHAN, JJ.

WHITE, J.

Finding no controlling precedent, the U.S. District Court for
the District of Nebraska has certified three questions of law,
pursuant to Neb. Rev. Stat. § 24-219 (Reissue 1985), to this
court. The facts giving rise to the controversy in this case have
been recited to us as follows.

The parties to the action in the U.S. District Court are
plaintiff, Thomas G. Harper, and defendants Dr. Norberto R.
Silva and Falls City Surgical Associates. The State of Nebraska
Excess Liability Fund was originally impleaded as a third-party
defendant, then later named as a defendant in a separate
complaint. At all times relevant to this action Dr. Silva was a
resident of Nebraska and employed by Falls City Surgical
Associates. Both Dr. Silva and his employer are qualified health
care providers under Nebraska statutes.

At the time of the alleged negligent acts, Dr. Silva was
licensed to practice medicine in both Nebraska and Kansas. The
parties agree that Dr. Silva, while acting within the scope of his
employment, departed from the normal standard of care. As a

result the plaintiff required additional treatment and medical care. All acts of negligence occurred in Kansas. The negligence of Dr. Silva is imputed to his employer, Falls City Surgical Associates, on the theory of respondeat superior. The net damages suffered by the plaintiff total $215,000, of which $100,000 has been paid by the defendants' insurer. The U.S. District Court has addressed the following questions to this court:

1. Whether the Nebraska Excess Liability Fund created by [Neb. Rev. Stat. § 44-2829 (Reissue 1984)], may be liable for negligent acts of qualified doctors which are committed outside the boundaries of the State of Nebraska.

2. Whether, when a plaintiff sues both a physician and the professional corporation with which he is associated, both of whom are qualified health care providers under the Act, each must separately pay $100,000.00 before the Excess Liability Fund may be called upon to pay damages.

3. Whether, in the circumstances of this case, interest should be payable to the plaintiff from the date of the stipulation between the plaintiff and the Fund as to the amount of plaintiff's damages.

Addressing the first question of whether the Nebraska Excess Liability Fund is liable for the negligent acts of qualified physicians which are committed outside the boundaries of the State of Nebraska, the plaintiff bases his argument that the fund is liable on two grounds: first, that the relationship between the defendant Dr. Silva and the State of Nebraska is sufficient to bring this case under the Nebraska Hospital-Medical Liability Act, Neb. Rev. Stat. §§ 44-2801 to 44-2855 (Reissue 1984); and, second, that it is the intent of the act to cover acts of negligence committed by qualified physicians outside the boundaries of the state. We agree with neither contention.

The plaintiff argues that the issues presented by the case at hand are very similar to the issues presented to the Supreme Court of Michigan by the case of *Sexton v Ryder Truck Rental*, 413 Mich. 406, 320 N.W.2d 843 (1982). In this case the Michigan Supreme Court faced the issues of whether the

doctrine of lex loci delicti was still viable in that state and whether Michigan's owners' liability statutes have extraterritorial applicability. *Sexton* consolidated two cases brought under Michigan's owners' liability statutes. The first was a case in which a Ryder rental truck, rented in Michigan by Michigan residents, was involved in a one-vehicle accident in Virginia. Sextons sued Ryder for damages. The second case involved an aircraft rented in Michigan by a Michigan corporation, which crashed in Ohio and killed the pilot and a passenger. The survivors of the passenger sued the leasing company. In both cases the only contact with the state in which the accident occurred was that the accident occurred there. In *Sexton* neither plaintiff had any connection with the state in which the accident occurred, nor was there any damage to the property or residents of Virginia or Ohio.

Applying what appears to be a traditional sufficiency of the contacts analysis, the Michigan Supreme Court held that the application of the Michigan owners' liability statutes to these cases was not extraterritorial, since the owner-operator relationship took place exclusively in Michigan. In each case the only contact with the place of the accident was that the accident occurred there. All other contacts were between the parties and the State of Michigan. The plaintiff now argues that in the case at hand, under the *Sexton* theory, the application of the Nebraska Hospital-Medical Liability Act to this case would not be an extraterritorial application of that act.

There are substantial differences between the case at bar and the facts of the cases involved in *Sexton.* This case involves more contact with the state in which the injury occurred than simply that the injury occurred there. Dr. Silva was licensed to practice in Kansas, and the injury occurred in Kansas to a Kansas resident. Any analogy that the plaintiff attempts to draw between this case and *Sexton* fails in view of these differences.

Additionally, Nebraska appears to follow the approach of Restatement (Second) of Conflict of Laws, which provides:

> In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the

particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 146 at 430 (1971). See, e.g., *Crossley v. Pacific Employers Ins. Co.*, 198 Neb. 26, 251 N.W.2d 383 (1977). From a traditional balancing of contacts approach, the *Sexton* court logically concluded that the State of Michigan would have more interest in the cases involved than either Ohio or Virginia. We cannot, under these facts, conclude that there are more contacts with the State of Nebraska than with the State of Kansas. Clearly, the State of Kansas here has a far more significant interest in this case in view of the relationship it has to the parties involved.

The plaintiff next argues that the legislative intent of the Nebraska Hospital-Medical Liability Act is to provide for extraterritorial application of the act, citing in support several cases from other states which have permitted extraterritorial application of workers' compensation statutes and dramshop acts. Again, we cannot accept the plaintiff's contention. The general rule governing the issue of extraterritorial application is that statutes enacted by a state legislature apply to all rights which, and all persons who, come within the limits of the state. 73 Am. Jur. 2d *Statutes* § 356 (1974). From our examination of the language of the act itself and its legislative history, we can find nothing which either specifically limits the act to this state or provides for application of the act beyond the boundaries of this state.

The first section of the act provides:

(1) The Legislature finds and declares that it is in the public interest that competent medical and hospital services be available *to the public in the State of Nebraska at reasonable costs*, and that prompt and efficient methods be provided for eliminating the expense as well as the useless expenditure of time of physicians and courts in nonmeritorious malpractice claims and for efficiently resolving meritorious claims. It is essential in this state to assure continuing availability of medical care and to encourage physicians to enter into the practice of medicine

in Nebraska and to remain in such practice as long as such physicians retain their qualifications.

(2) The Legislature further finds that at the present time under the system in effect too large a percentage of the cost of malpractice insurance is received by individuals other than the injured party. The intent of sections 44-2801 to 44-2855 is to serve the public interest by providing an alternative method for determining malpractice claims in order to improve the availability of medical care, to improve its quality and to reduce the cost thereof, and to insure the availability of malpractice insurance coverage at reasonable rates.

(Emphasis supplied.) § 44-2801. This language only suggests that the intent of the Legislature in enacting the Nebraska Hospital-Medical Liability Act was to ensure that hospital and medical care be available to the people of Nebraska, but does not expressly limit the application to citizens of Nebraska and, more importantly, does not provide for extraterritorial application.

It is a settled principle of statutory construction that when ambiguity exists, recourse should be had to legislative history to determine the intent of the lawmakers. *Witherspoon v. Sides Constr. Co.*, 219 Neb. 117, 362 N.W.2d 35 (1985). The introducer's statement of purpose during the committee hearings for L.B. 703 reads:

This Bill relates to the problem which confronts hospitals, members of the medical profession and citizens of this state as a result of the great increase in malpractice litigation and the cost of such litigation as well as the great increase in the cost of malpractice insurance and the questionable availability of such insurance in the future.

. . . .

Failure to enact this type of legislation could result in the loss of professional services that are presently available to the citizens of this state. It is imperative that the Legislature act now in order that insurance coverage will continue to be available to all members of the medical profession.

Statement of Purpose, L.B. 703, Public Health and Welfare

Committee, 84th Leg., 2d Sess. (Jan. 27, 1976).

Later, in the committee hearing, Senator Cavanaugh stated, "The ultimate goal here is to continue the best quality health care to the citizens of the state of Nebraska, and to devise some method to arrest the cost that [sic] health care due to escalating malpractice." Public Health and Welfare Committee Hearing, L.B. 703, 84th Leg., 2d Sess. 22-23 (Jan. 27, 1976). L.B. 703 was enacted in substance as 1976 Neb. Laws, L.B. 434.

In view of the language of the legislative history and the statement of the purpose of the act found in the first section of the Nebraska Hospital-Medical Liability Act, we conclude that the act was intended to cover only those qualified health care providers practicing within the boundaries of this state. The legislative history clearly states that the intent of the Nebraska Hospital-Medical Liability Act is to protect and encourage health care within the State of Nebraska and does not apply to an instance such as the one presented in the case before us involving injury to a Kansas citizen being operated on in the State of Kansas. By so finding, we need not address the second and third questions certified to this court.

JUDGMENT ENTERED.